UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| VICKI LYNN A.[1], | ) |
| Plaintiff, | ) |
| v. | ) CIVIL NO. 4:19cv42 |
| ANDREW M. SAUL, Commissioner of Social Security, | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), as provided for in the Social Security Act. Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for SSI must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ."

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act

2

through March 31, 2017.

2. The claimant has not engaged in substantial gainful activity since June 27, 2015, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spine; residual effects of acute pneumonia and respiratory distress; right knee degenerative joint disease; obesity; migraine headaches; bilateral carpel tunnel syndrome; anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can never climb ladders, ropes or scaffolds and no more than occasionally climb ramps, stairs, balance and stoop, kneel, crouch, crawl or reach overhead. The claimant requires the use of a cane for ambulation. She can frequently but not constantly use the upper extremities bilaterally for reaching, handling and fingering. She can never be exposed to unprotected heights and must avoid concentrated exposure to wet, slippery and/or uneven surfaces and to hazards such as dangerous moving, mechanical parts. She can have no more than occasional exposure to no more than moderate levels of environmental irritants such as fumes, odors, dusts or gases. The claimant is limited to unskilled work but is able to understand, remember and carry out simple instructions, can make judgments on simple work-related decisions, and can interact appropriately with the general public, supervisors and co-workers in a routine work setting, with simple tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 17, 1969 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability

3

> because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82041 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 27, 2105, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12- 26 ).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on October 15, 2019. On November 25, 2019, the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on December 12, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to

> the next step or, on steps 3 and 5, to a finding that the claimant is
> disabled. A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

On March 2, 2013, the Social Security Administration's consultative examining psychologist, Dr. Durak, conducted a psychological evaluation of Plaintiff. Dr. Durak noted Plaintiff's activities "lead to increased pain and increased fatigue, and she has to do things in a slow and methodical way so as not to aggravate her pain." (Tr. p. 363). Dr. Durak further noted,"... she has to constantly change positions in order to minimize her pain." (Tr. p. 365). Dr. Durak made an Axis IV diagnosis of "severe: chronic pain." (Tr. p. 365).

On July 24, 2015, Ms. Lori Krol, Plaintiff's treating primary care nurse practitioner, noted "joint stiffness," "joint pain," and "back problems." (Tr. p. 509). On July 29, 2015, Plaintiff had a CT scan of her lumbar spine. Plaintiff had a bulging disc at 1 4-15, and spondylolysis at L5-Sl. (Tr. p. 450).

In an office visit on October 19, 2015, Dr. Ungar-Sargon, Plaintiff's treating board certified neurologist, examined Plaintiff and observed spasms and tenderness in the cervical spine, the thoracic spine, and the lumbar spine. In addition, the clinical tests, the Ober's test, Thomas test, Pace's sign, FABER test, straight leg raising test, and Trendelenburg's test, were all positive. Plaintiff also had left hip tenderness. Dr. Ungar-Sargon diagnosed Plaintiff with bilateral hip pain, cervical disc displacement, and lumbar disc displacement. Dr. Ungar-Sargon's treatment

5

plan for Plaintiff included medication, orthopedic bracing, and spinal injections. (Tr. p. 395-396). On November 3, 2015, Dr. Ungar-Sargon, indicated Plaintiff's functional limitations: frequently lift and or carry less than 10 pounds; stand or walk less than 2 hours of an 8 hour day; sit less than 6 hours of an 8 hour day; limited in the upper and lower extremities; never climb, balance, stoop, kneel, crouch, or crawl; Limited reaching, handling, fingering, and feeling; and avoid all exposure to cold, heat, wetness, humidity, noise, vibration, fumes, and hazards. (Tr. p. 386-389).

On January 8, 2016, Dr. Jao, the Social Security Administration's consultative examining physician, noted Plaintiff "is unable to bend or squat and has a limited range of motion in her arms." (Tr. p. 549). Dr. Jao's physical examination revealed tenderness and decreased range of motion in the lumbar and cervical spine, with a positive straight leg raising test bilaterally. (Tr. p. 551). Dr. Jao further observed Plaintiff has an antalgic gait, is unable to stoop and squat, unable to walk heal to toe and tandemly, and had difficulty standing from a sitting position. (Tr. p. 551).

On March 8, 2016, Plaintiff had a sensory and motor nerve conduction study. The study indicated Plaintiff has a loss of peroneal axons motor and sensory. (Tr. p. 633).

On May 21, 2016, Dr. Jao, the Social Security Administration's consultative examining physician, conducted a second examination of Plaintiff. Dr. Jao indicated Plaintiff had "weakness," "poor balance," and "headaches." (Tr. p. 741). During this examination, Dr. Jao noted tenderness in Plaintiff's lumbar spine, and tenderness and restricted range of motion in Plaintiff's cervical spine. (Tr. p. 742). Dr. Jao further noted Plaintiff was able to stoop and squat with difficulty, and was capable of standing from a sitting position with difficulty. (Tr. p. 742).

On June 13, 2016, Dr. Ungar-Sargon indicated Plaintiff has lumbar spondylolisthesis, and lumbar radiculopathy. Dr. Ungar-Sargon indicated Plaintiff's prognosis was poor, and she had a

6

neuro-anatomic distribution of pain. (Tr. p. 754). Dr. Ungar-Sargon identified the following positive objective signs: reduced range of motion, positive straight leg raising test, abnormal gait, sensory loss, reflex loss, and tenderness. Dr. Ungar-Sargon indicated Plaintiff has the following functional limitations: walk less than a block without rest or severe pain; wit for 1 hour at a time and less than 2 hours in an 8 hour day; stand for 1 hour at a time and less than 2 hours in an 8 hour day; and would need to be able to shift positions at will. (Tr. p. 755).

Dr. Ungar-Sargon indicated Plaintiff would need to take unscheduled breaks every hour, and must use a cane or other assistive device for occasional standing and walking. Dr. Ungar-Sargon further indicated Plaintiff was limited to lifting and carrying less than 10 pounds for 5% of the day or less. In addition, Dr. Ungar-Sargon indicated Plaintiff could rarely twist, and could never stoop or bend, crouch or squat, or climb. Finally, Dr. Ungar-Sargon indicated Plaintiff was limited to reaching in front of her and over her head to 10% of the day with both arms. (Tr. p. 756). Finally, Dr. Ungar-Sargon indicated Plaintiff would be off task 25% or more of the time, was incapable of even low stress work, and would be absent from work more than 4 days per month. (Tr. p. 757). On July 16, 2016, Dr. Ungar-Sargon indicated Plaintiff's lumbar spine disorder caused pseudoclaudication, chronic nonradicular pain, muscle weakness, prevented Plaintiff from ambulating effectively, and Plaintiff needs a cane to ambulate. (Tr. p. 759-760).

On March 6, 2017, Plaintiff had a second sensory and motor nerve conduction study. Once again, the study indicated Plaintiff has a loss of peroneal axons causing the loss of movement and sensation to Plaintiff's legs and feet. (Tr. p. 13143).

On March 21, 2017, Plaintiff had a second CT scan of her lumbar spine. This CT scan indicated Plaintiff has left facet arthritis at L3-L4, right facet arthritis at L4-L5, and bilateral

spondylolysis at L5-Sl. (Tr. p. 12987).

On August 10, 2017, Dr. Ungar-Sargon noted Plaintiff's pain medication was not effective and was not adequately addressing her pain. Plaintiff was also sleeping poorly, has muscle weakness, and using a cane in the house when she needs it. (Tr. p. 13102-13103).

On July 29, 2015, a CT scan was taken of Plaintiff's cervical spine. The CT scan disclosed the presence of a "suspicious" 9 mm pulmonary nodule in the right apex. (Tr. p. 449). However, subsequently on October 26, 2015, a CT scan of Plaintiff's lungs indicated there was no pulmonary nodule. (Tr. p. 456).

On January 8, 2016, the Social Security Administration's consultative examining physician, Dr. Jao, noted Plaintiff had shortness of breath. (Tr. p. 549). On May 21, 2016, Dr. Jao conducted a second consultative examination of Plaintiff, and again noted shortness of breath. (Tr. p. 549).

On January 26, 2017, after Plaintiff's surgery, N.P. Krol treated Plaintiff, and diagnosed Plaintiff with a lung disorder, chest pain, abnormal finding in the lungs and pneumonia. (Tr. p. 13005). On March 21, 2017, a CT scan of Plaintiff's chest revealed two pulmonary nodules in Plaintiff's right lung, and cavitation in the right lung. (Tr. p. 12988).

On March 21, 2017, Plaintiff was examined and treated by Dr. Ungar-Sargon. Dr. Ungar-Sargon observed a "huge scar on right chest from recent surgery," anterior sternal tenderness on palpitation, and respiratory distress. (Tr. p. 13139).

On April 20, 2017, Dr. Ungar-Sargon noted Plaintiff was experiencing "shortness of breath and constant numbness and tingling in her [right] rib cage area." Dr. Ungar-Sargon's examination again mentioned the lung surgery scar, anterior sternal tenderness, and respiratory

8

distress. (Tr. p. 13131 and 13134).

On April 25, 2017, Dr. Ungar-Sargon again noted shortness of breath. (Tr. p. 13127). Dr. Ungar- Sargon also noted "tenderness of manubriosternal joint, anterior chest wall tenderness (costochondritis), lung parenchyma, and respiratory distress. (Tr. p. 13128-13129).

On June 29, 2015, Dr. Ungar-Sargon examined Plaintiff, and Plaintiff had a positive Ober's test, which is a sign of iliotibial tract contracture. (Tr. p. 447). In 27 subsequent examinations, Dr. Ungar-Sargon indicated Plaintiff had a positive Ober 's test.

On November 3, 2015, Dr. Ungar-Sargon indicated Plaintiff could stand and walk less than 2 hours of an 8 hour day, was limited in her lower extremities, and could never climb, balance, stoop, kneel, crouch, or crawl. (Tr. p. 386-387). On November 16, 2015, Dr. Ungar-Sargon noted "weakness in bilateral legs." (Tr. p. 413).

On January 8, 2016, the Social Security Administration's consultative examining physician, Dr. Jao, indicated Plaintiff had an antalgic gait, and was unable to stoop or squat. (Tr. p. 551).

On March 8, 2016, a nerve conduction study indicated there was a "loss of peroneal axons motor and sensory."11 (Tr. p. 633).

On May 21, 2016, the Social Security Administration's consultative examining physician conducted a second examination of Plaintiff. On this occasion, Dr. Jao observed pain and stiffness in the right leg, and Plaintiff had difficulty stooping, squatting, and standing. (Tr. p. 742).

On June 13, 2016, Dr. Ungar-Sargon indicated Plaintiff could only walk less than a block without rest or severe pain. Dr. Ungar-Sargon further indicated Plaintiff could stand and walk

9

less than 2 hours per day and needed to shift positions at will. (Tr. p. 775). Dr. Ungar-Sargon also indicated Plaintiff needed an assistive devise for walking and standing, could rarely twist, and never stoop, bend, crouch, squat, or climb. (Tr. p. 756).

On July 16, 2016, Dr. Ungar-Sargon indicated Plaintiff could not "ambulate effectively", could not walk a block at a reasonable pace, could not use public transportation, could not carry out ambulating activities like shopping and banking, could not climb stairs at a reasonable pace, and needed a cane to ambulate. (Tr. p. 760).

On March 6, 2017, a second nerve conduction study confirmed the loss of peroneal axons. (Tr. p. 13143).

On August 10, 2017, Dr. Ungar-Sargon noted Plaintiff was experiencing weakness and limited functioning, and needed to use a cane. (Tr. p. 13102-13103).

On January 8, 2016, the Social Security Administration's consultative examining physician noted Plaintiff's Body Mass Index was 33.8. (Tr. p. 550). On May 21, 2016, the Social Security Administration's consultative examining physician described Plaintiff as an "obese female," and her BMI was 36.6. (Tr. p. 741). On April 18, 2017, N.P. Lori Krol treated Plaintiff for weight gain, and diagnosed Plaintiff with obesity, and a BMI of 41.4. (Tr. p. 12997-12998).

On June 29, 2015, Dr. Ungar-Sargon examined Plaintiff, and noted Plaintiff [was positive for] migraine headaches. (Tr. p 446). In 14 subsequent examinations, Dr. Ungar-Sargon indicated Plaintiff had migraine headaches. In two subsequent examinations Plaintiff's headaches were called "tension headaches." (Tr. p. 13152 and 13170).

On January 9, 2016, the Social Security Administration's consultative examining psychologist noted, "she has migraine headaches, on average, two times a month, with each

lasting approximately two hours." (Tr. p. 556).

On May 21, 2016, Dr. Jao, the Social Security Administration's consultative examining physician, noted Plaintiff has a history of migraine headaches, which was diagnosed in 2012, and that Plaintiff was taking prescribed medication for the migraine headaches. (Tr. p. 743).

On August 27, 2015, Plaintiff had a sensory and motor nerve conduction study. Plaintiff had left median motor delays. Dr. Ungar-Sargon's diagnosis was left carpal tunnel syndrome of moderate severity. (Tr. p. 432). On August 31, 2015, Plaintiff had an electromyogram. The results indicated Plaintiff has a left abductor pollicis brevis muscle de-nervation. Plaintiff was again diagnosed with left carpal tunnel syndrome. (Tr. p. 427). On October 19, 2015, Dr. Ungar-Sargon noted Plaintiff "drops things from both hands everyday," and "has numbness in both hands." (Tr. p. 393). Dr. Ungar-Sargon diagnosed Plaintiff with bilateral carpal tunnel syndrome. (Tr. p. 395).

On November 3, 2015, Dr. Ungar-Sargon indicated Plaintiff was limited to lifting less than 10 pounds, and based his opinion on Plaintiff's carpal tunnel syndrome and the electromyogram report. (Tr. p. 386-387). In regard to Plaintiff's manipulative limitations, Dr. Ungar-Sargon indicated Plaintiff was limited in reaching, handling, fingering, and feeling, which was again based on the electromyogram report. (Tr. p. 388 and 390).

On January 8, 2016, Dr. Jao, the Social Security Administration's consultative examining physician, noted Plaintiff "was diagnosed with carpal tunnel syndrome in 2013 and has pain and numbness in both hands and wrists. She has difficulty grasping and gripping objects without dropping them." (Tr. p. 549). In addition, Dr. Jao's clinical examination revealed Plaintiff's significantly reduced range of motion in her bilateral wrists. (Tr. p. 553).

During the same examination, Dr. Jao conducted dynamometer testing of Plaintiff's grip

11

strength. (Tr. p. 551). Using the right hand, Plaintiff was only able to generate 6.3 kg. of force. A woman's grip strength in the right hand is considered poor if it is less than 22 kg. of force. If Plaintiff's grip strength in her right wrist was 300% stronger she would still have a poor grip strength rating. Using her left hand, Plaintiff was only able to generate 7.6 kg. of force. A woman's grip strength in the left hand is considered poor if it is less than 18 kg of force. If Plaintiff's grip strength was more than 200% stronger, she would still have a poor grip strength rating. Plaintiff's combined grip strength is 13.9 kg. A 69 year old woman's grip strength of 40 or below is in the "needs improvement" category. Therefore, Plaintiff's combined grip strength is far below half of the grip strength of a 69 year old woman who "needs improvement".

On March 2, 2013, the. Social Security Administration's consultative examining psychologist, Dr. Durak, observed Plaintiff's "motor activity was somewhat agitated," and "her mood and affect reflected depression." (Tr. p. 362). Dr. Durak diagnosed Plaintiff with a mood disorder and a current global assessment of functioning (GAF) of 55.14 (Tr. p. 365).

On September 3, 2015, nurse practitioner Michele Loughren conducted a mental status examination of Plaintiff. N.P. Loughren observed Plaintiff was "very difficult to follow as she is rapid and voluminous in speech, tangential, easily distracted and derailed." (Tr. p. 474). N.P. Loughren indicated Plaintiff has "fatigue," "malaise, apathy [and] sleep disturbance" (Tr. p. 475). N.P. Loughren indicated Plaintiff had the following issues: fidgety; speech was rapid and rambling; mood was up and down; intermittent anxiety; distractible; thoughts were distracted and tangential; suicidal ideation; impaired insight; and mildly impaired judgment. (Tr. p. 476). N.P. Loughren diagnosed Plaintiff with a mood disorder and a GAF of 50. (Tr. p. 477).

On November 30, 2015, N.P. Loughren completed a Psychiatric Review Technique. N.P.

Loughren indicated Plaintiff has the following issues: disturbance in mood, emotional lability, and impairment in impulse control, (Tr. p. 536); emotional withdrawal, and isolation, (Tr. p. 537); a depressive syndrome characterized by anhedonia, sleep disturbance, psychomotor agitation, difficulty concentrating or thinking, and easy distractibility, (Tr. p. 538); generalized persistent anxiety with motor tension, and autonomic hyperactivity, (Tr. p. 540); repeated episodes of decompensation of extended duration, (Tr. p. 546).

On January 9, 2016, the Social Security Administration's consultative examining psychologist, Dr. Durak conducted a second mental status examination of Plaintiff. Dr. Durak indicated Plaintiff's "thought content reflected themes of hopelessness, helplessness, and worthlessness. Her mood and affect were primarily depressed." (Tr. p. 557). Dr. Durak diagnosed Plaintiff with major depression, moderate. (Tr. p. 559).

On May 21, 2016, the Social Security Administration's consultative examining physician, Dr. Jao, observed, "there is change in mood, memory loss, with suicidal ideations." (Tr. p. 741). On the same day, the Social Security Administration's consultative examining psychologist, Dr. Durak, conducted another mental status examination. Dr. Durak observed, "she tends to ramble and often had to be refocused into answering the question.... Concentration was distractible. Memory was inconsistent .... Her mood and affect were anxious and depressed." (Tr. p. 748). Dr. Durak also conducted the Wechsler Memory Scale IV. The test indicated the extent of Plaintiff's memory problems: auditory memory at the 5th %, borderline range; visual memory at the 4th %, borderline range; visual working memory at the 13th %, low average range; immediate memory at the 1st %, extremely low range; and, delayed memory at the 4th %, borderline range. (Tr. p. 750).

Dr. Durak opined her test might be a slight under-representation of her memory abilities.

13

(Tr. p. 748). On August 31, 2017, Plaintiff was still being treated by N.P. Michele Loughren. The mental status examination indicated a continuing diagnosis of mood disorder with a GAF of 55. (Tr. p. 13095).

In support of remand, Plaintiff first argues that the ALJ failed to properly weigh medical opinion evidence. "ALJs must decide the weight of a treating physician's opinion by considering, to the extent applicable, the treatment relationship's length, nature, and extent; the opinion's consistency with other evidence; the explanatory support for the opinion; and any specialty of the treating physician." *Gerstner v. Berryhill*, 879 F.3d 257,263 (7th Cir. 2018). If the ALJ fails to weigh the medical opinion evidence, substantial evidence does not support the decision, and the case must be remanded for consideration of the medical opinions.

Plaintiff argues that the ALJ failed to weigh the medical opinions of Plaintiff's primary care nurse practitioner, Lori Krol. Nurse practitioners like Ms. Krol were not "acceptable medical sources" prior to 2006. However, in 2006 the Social Security Administration indicated with the growth of managed health care nurse practitioners have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled by physicians. Therefore, the opinions from nurse practitioners are important and should be evaluated. Social Security Ruling 06-03p. In 2017, the Social Security Administration rescinded SSR 06-03p, because the Social Security Regulations no longer make a distinction between acceptable medical sources and other medical sources. 20 C.F.R. § 404.1520(c).

Plaintiff points out that N.P. Krol treated Plaintiff from 2014 through 2017. N.P. Krol first diagnosed Plaintiff with anxiety in 2014. (Tr. p. 491). N.P. Krol diagnosed Plaintiff with depression in 2015. (Tr. p. 491). On July 24, 2015, N.P. Krol noted Plaintiff had joint pain, back

14

problems, joint stiffness, was seeing Dr. Ungar-Sargon for pain management, and a chiropractor. (Tr. p. 509). On January 18, 2016, N.P. Krol was treating Plaintiff's insomnia, due to a mental disorder, with medication. (Tr. p. 601). On March 17, 2016, N.P. Krol diagnosed and treated Plaintiff for fatigue. (Tr. p. 736).

On March 24, 2016, N.P. Krol observed bilateral swelling in the legs with pitting edema. In addition, Plaintiff was noted to have sluggish peripheral artery pulses. (Tr. p: 739). On March 21, 2017, N.P. Krol was treating Plaintiff for weight gain and obesity. Plaintiff's BMI was 41.4. (Tr. p. 12998).

Plaintiff points out that the ALJ never mentioned any of N.P. Krol's findings or treatment. "The ALJ either did not consider [the] opinion, or considered it but assigned it no weight. If the former, remand is appropriate ....If the latter, remand is appropriate ... " *Kneeland v. Berryhill*, 850 F.3.d 749, 761 (5th Cir. 2017).

Plaintiff further argues that The ALJ also failed to weigh the medical opinions of the Social Security Administration's consultative examiners. The ALJ did recite some of the evidence from Dr. Jao's and Dr. Durak's reports that tended to support the ALJ's conclusions. However, the ALJ either ignored or minimized the objective medical evidence in their reports. The ALJ also ignored the glaring inconsistencies within their reports to craft a false impression regarding Plaintiff's functional limitations.

In particular, Dr. Jao indicated Plaintiff had a limited range of motion in her arms, pain and numbness in both hands and wrists, and difficulty grasping and gripping objects without dropping them. (Tr. p. 549). In addition, Dr. Jao conducted dynamometer testing, which confirmed the foregoing findings. The objective medical evidence demonstrated profound

15

weakness in Plaintiff's bilateral grip strength. (Tr. p. 551). The ALJ summarized Dr. Jao's report: "normal grip strength at 5/5 bilaterally." (Tr. p. 18). The ALJ never mentions the obvious contradictions in the report, and never weighs Dr. Jao's opinion. "An ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016).

Also, Dr. Durak observed Plaintiff tends to ramble, has to be refocused to answer questions, concentration was distractible, and memory was inconsistent. (Tr. p. 748). Dr. Durak also conducted Weschler Memory Scale IV testing. The objective testing indicated Plaintiff's profound memory deficiencies. (Tr. p. 750). The ALJ's focus was not on the objective testing results. The ALJ's focus was on Dr. Durak's opinion that Plaintiff's test results "might be a slight under-representation of her memory abilities." (Tr. p. 18). Once again, the ALJ failed to confront the inconsistencies in the evidence, and failed to weigh Dr. Durak's opinions. The ALJ failed to assign weight to any of the foregoing opinions. The ALJ failed to give specific reasons for disregarding all or parts of the foregoing opinions. This is error and requires a remand to consider and weigh the medical opinions of N.P. Krol, Dr. Jao, and Dr. Durak. *Gerstner*, at 263.

In response, The Commissioner acknowledges N.P. Krol "was one of [Plaintiff's] treating sources." The Commissioner does not deny the ALJ failed to mention any of N.P. Krol's findings, or treatment notes. The Commissioner's defense is "an ALJ is not required to explicitly address every piece of testimony and evidence in his written decision." The Commissioner's reliance on *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), is misplaced. The Court in *Haynes* actually stated, "the ALJ need not...provide a 'complete written evaluation of every piece of testimony and evidence.'" *Haynes*, at 626. In addition, the foregoing

statement was made in the context of the previous sentence, " ... the ALJ must build a logical bridge from the evidence to his conclusion." *Haynes*, at 626. The Commissioner also claims N.P. Krol "did not provide a 'medical opinion.'" However, as Plaintiff points out, the record is replete with instances of medical opinions provided by N.P. Krol.

Likewise, the Commissioner acknowledges Dr. Jao and Dr. Durak were consultative examining physicians. The Commissioner, once again, does not deny the ALJ failed to weigh the medical opinions of the consultative examining physicians. The Commissioner contends that neither Dr. Jao nor Dr. Durak rendered a 'medical opinion.' Yet, as Plaintiff points out, the record is replete with instances of diagnoses and medical opinions provided by Dr. Jao and Durak. Thus, remand is warranted on this issue.

Next, Plaintiff argues that the ALJ failed to follow Social Security Regulations in evaluating the remaining medical evidence. Plaintiff contends that the medical opinion of every physician in the case was either not weighed at all or was given little weight.

"An ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). *Boiles v. Barnhart*, 395 F.3d 421,425 (7th Cir. 2005). "ALJs are required to rely on expert opinions instead of determining the significance of particular findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). "The ALJ was not qualified to make his own determination without the benefit of an expert opinion." *Akin v. Berryhill*, 887 F.3d 314, 317-318 (7th Cir. 2018). "Being unable to discern how - apart from substituting his own judgment for that of medical witnesses - the ALJ reached his determination regarding the degree of [the claimant's] impairments, we must reverse and remand for further proceedings." *Rohan v. Chater*, 98 F.3d

966, 970-971 (7th Cir. 1996). The degree to which the ALJ dete1mined the significance of medical findings himself is apparent from the person the ALJ gave the most weight. Curiously, the ALJ gave greater weight to Plaintiff's mother, who has no medical training and suffers from dementia, than to any of the medical experts in the record.

"An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contrary opinion of a non-examining physician does not suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). If the contradicting opinion of a non-examining physician does not constitute substantial evidence, then the contrary opinion of an elderly woman, without any medical training and suffering from advanced dementia, is not substantial evidence. The ALJ's improper weighing of the medical opinion evidence is not supported by substantial evidence and warrants remand.

Next, Plaintiff argues that the ALJ's RFC assessment fails to include all of Plaintiff's impairments and is not supported by substantial evidence. An ALJ must evaluate all relevant evidence when determining a claimant's residual functional capacity, including evidence of impairments that are not considered severe. *Arnett v. Astrue*, 676 F.3d 583 (7th Cir. 2012). The ALJ must also analyze a claimant's impairments in combination. *Terry v. Astrue*, 580 F.3d 470 (7th Cir. 2009).

Plaintiff claims that the ALJ failed to weigh the medical opinions of nurse practitioner, Lori Krol, Dr. Jao, and Dr. Durak. In addition, the ALJ improperly weighed the medical opinions of long-term treating nurse practitioner, Michele Loughren, and long-term treating board certified neurologist, Dr. Ungar-Sargon.

Plaintiff further contends that the ALJ's RFC fails to make any provisions for Plaintiff's

severe impairments of migraine headaches and anxiety. Plaintiff's frequent migraine headaches, which cause nausea and require quiet isolation in a dark room, would at a minimum cause Plaintiff to be "off task." The ALJ failed to make any provision for Plaintiff's migraine headaches in the RFC assessment even though the ALJ found Plaintiff's migraines were a severe impairment, which significantly limits Plaintiff's ability to do basic work activities. (Tr. p. 13).

Plaintiff testified that her anxiety results from being around a lot of people, her elderly mother with advanced dementia, driving, leaving the house, and "pretty much everything else I do." Plaintiff argues that her anxiety would cause her not to be able to respond appropriately to the general public, would not be able to respond to co-workers and supervisors, drive or take public transportation to get to work, or even show up for work. The ALJ failed to make any provision for Plaintiff's anxiety even though the ALJ found Plaintiff's anxiety was a severe impairment, which significantly limits Plaintiff's ability to do basic work activities.. (Tr. p. 13).

Plaintiff also maintains that the ALJ's RFC assessment is based on factual errors. The ALJ indicated Plaintiff "can frequently (up to 2/3 of the day) ... use the upper extremities bilaterally for reaching, handling, and fingering." (Tr. p. 16). The ALJ specifically indicated Plaintiff has a "normal grip strength at 5/5 bilaterally." (Tr. p. 18). However, objective medical testing, namely dynamometer testing, demonstrated profoundly weak grip strength in both hands making her weaker than a 69 year old woman who "needs improvement." (Tr. p. 551). The ALJ's finding and RFC assessment inaccurately minimizes Plaintiff's carpal tunnel syndrome, which the ALJ indicated was a severe impairment. The ALJ's RFC finding that Plaintiff can frequently use her upper extremities for reaching, handling, and fingering constitutes a factual error.

Plaintiff notes that the ALJ finds Plaintiff is limited to unskilled work, but is able to

understand, remember, and carry out simple instructions, can make judgments on simple work-related decisions in a routine work setting, with simple tasks. (Tr. p. 16). However, this finding does not address Plaintiff's "moderate limitation" in "understanding, remembering, or applying information." (Tr. p. 14).

The ALJ must build an accurate and logical bridge between the evidence and the result. If the evidence does not support the conclusion, the Court cannot uphold the decision. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). Clearly, the ALJ's RFC assessment is not supported by substantial evidence and remand is required.

## Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

Entered: January 13, 2020.

s/ William C. Lee  
William C. Lee, Judge  
United States District Court
